IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BETTY JO WEBSTER,            )
                             )
         Plaintiff,          )
                             )
                             )
                             )  No. 12 C 3513
   v.                        )
                             )  Magistrate Judge Sidney I. Schenkier
                             )
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,[1]  )
                             )
         Defendant.          )

## MEMORANDUM OPINION AND ORDER[2]

Betty Jo Webster has filed a motion seeking reversal or remand of a determination by the Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") (doc. # 13). The Commissioner, in turn, has filed a response seeking affirmance of that same determination (doc. # 18). For the reasons set forth below, the Court grants Ms. Webster's motion and reverses and remands the decision of the Commissioner.

I.

On August 12, 2009, Ms. Webster filed applications for disability benefits, claiming disability based on asthma, back problems, and hypertension (R. 135, 142, 168). Ms. Webster alleged an onset date of April 1, 2009 (R. 135, 142), and the date of her last insured status was

---

[1]On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25, Carolyn W. Colvin is automatically substituted as defendant.

[2]On August 16, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (docs. ## 10, 11).

December 31, 2010 (R. 158). Her claim was first denied on October 30, 2009, and was denied again upon reconsideration on March 2, 2010 (R. 66, 71, 75). Ms. Webster requested and was granted a hearing, which was held before an Administrative Law Judge ("ALJ") on October 19, 2010 (R. 24-59). In a written opinion issued on November 29, 2010, the ALJ concluded that Ms. Webster was not disabled and denied her DIB and SSI (R. 12-19). The Appeals Council denied Ms. Webster's request for review of the ALJ's decision (R. 1–4), making the ALJ's decision the final decision of the Commissioner. *See Shauger v. Astrue*, 675 F. 3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. Part A sets forth the general background, followed by Part B, which summarizes Ms. Webster's medical records, as well as those of the agency doctors who reviewed her case. Part C discusses Ms. Webster's activities of daily living, and Parts D and E review the hearing testimony and the ALJ's written opinion, respectively.

### A.

Ms. Webster was born on July 11, 1957, and was 51 years old on the alleged disability onset date, April 1, 2009 (R. 135, 142). She completed school through ninth grade and has worked as a nurse's aide at a nursing home (R. 174, 188). Ms. Webster stopped working on April 1, 2005, and alleges that she became unable to work due to her asthma, back problems, and hypertension on April 1, 2009 (R. 168-69). She is 5'4½" and weighed 240 pounds on September 21, 2009 (R. 231).

**B.**

**1.**

Ms. Webster supplied treatment records from August 2008 through August 2010 from the Emergency Department at John H. Stroger, Jr. Hospital ("ER") (R. 224-28, 247-54, 258-353, 363) and prescription records from the pharmacy at Oak Forest Hospital from December 13, 2010 (R. 354-362). Based on these records, it appears that the ER was Ms. Webster's sole source of medical treatment during this period, beginning with a visit for back pain in August 2008 (R. 264, 324-26, 343-44). The treatment notes from that day reflect that she had a history of asthma and back pain, but had no dizziness, weakness, numbness, or difficulty walking (R. 324). She was given new prescriptions for ibuprofen, acetaminophen-hydrocodone,[3] and diazepam,[4] and a renewal for albuterol (R. 264, 343-44). A radiology report from that visit noted "[d]egenerative changes" in her lumbosacral spine (R. 281). Ms. Webster returned to the ER on October 30, 2008, with complaints of back and abdominal pain (R. 226-27, 319-23, 341-42). The treatment notes reflect "mild tenderness" to the lumbosacral spine, a negative straight leg test, and elevated blood pressure, but no history of hypertension and no edema (R. 319). She was given Vicodin and rated her pain level at 2 out of 10 when she was discharged (R. 321). She

---

[3]This is the generic name of this drug, for which one of the brands is Vicodin. DRUGS.COM, Vicodin, http://www.drugs.com/vicodin.html (last visited June 17, 2013).

[4]Diazepam is the generic name for Valium. DRUGS.COM, Diazepam, http://www.drugs.com/diazepam.html (last visited June 17, 2013).

3

left with prescriptions for methocarbamol (a muscle relaxant), acetaminophen, hydroclorothiazide,[5] and ranitidine[6] (R. 322, 341).

Ms. Webster next visited the ER on April 28, 2009, with complaints of chest pain (R. 261, 268-69, 279-80, 288, 317-18, 339-40). She was diagnosed with an asthma exacerbation (R. 269). An electrocardiogram from that visit was normal (R. 288). A radiology report listed the following findings: "The heart is borderline enlarged in size. No vascular congestion is present. . . . No lung consolidation. No pleural effusion or pneumothorax. Degenerative disease is present in the spine" (R. 279).

Later in 2009, Ms. Webster sought care on three occasions – September 3, November 28, and December 7 – for back pain and chest pain or shortness of breath (R. 248-49, 275-78, 287, 312-16, 337-38, 250-52, 263, 307-11, 332-36, 253-54, 262, 305-06, 332-33). A radiology report from the September visit compared views of her lumbar spine to views taken in August 2008 and found "[d]egenerative changes at L5/S1 level. No significant change from the comparison exam" (R. 275). Another radiology report from the same visit reported "[m]ild multi-level degenerative joint disease" with "no evidence of spondylolisthesis or spondylolysis" in assessing x-rays of her thoracic spine (R. 277). At these visits, Ms. Webster received prescriptions for methocarbamol, diazepam, prednisone, acetaminophen-hydrocodone, ibuprofen, and albuterol (R. 248, 313, 250-51, 263, 308, 310, 253, 262, 306, 332-33, 335, 337-38).

On January 21, 2010, Ms. Webster returned to the Emergency Department with pain in her back and her left thumb (R. 265-67, 273, 301-03, 330-31, 363). At this visit, Ms. Webster

---

[5]"Hydrochlorothiazide is used alone or together with other medicines to treat high blood pressure (hypertension)." MAYOCLINIC.COM, Hydrochlorothiazide (Oral Route), http://www.mayoclinic.com/health/drug-information/DR602673 (last visited June 17, 2013).

[6]Ranitidine is used to treat and prevent ulcers in the stomach and intestines. It also treats conditions in which the stomach produces too much acid, gastroesophageal reflux disease (GERD), and other conditions that cause heartburn. DRUGS.COM, Ranitidine, http://www.drugs.com/ranitidine.html (last visited June 17, 2013).

4

received a referral for primary care, was instructed to follow up with primary care within two weeks (R. 331), and it appeared that she had an appointment with a pain clinic for February 16, 2010 (R. 201, 267, 301). The pain in her thumb had begun two weeks earlier without trauma (*Id.*). The radiology report on her thumb from this visit showed "[m]ild osteoarthritis . . . of the first metacarpophalangeal joint. No evidence of bone destruction or periosteal reaction. Rest of the bony contours and joint spaces are within normal limits" (R. 363). As with all her prior visits, Ms. Webster was treated with prescription-strength pain medications, given prescriptions for pain and asthma, and released (R. 265, 331).

Throughout the remainder of 2010, Ms. Webster made frequent visits to the ER complaining of severe back pain (March 16: R. 258-60, 298-300; April 28: R. 347; June 11: R. 345; June 23: R. 272, 285-86; July 14: 346, 349; August 11: 348; August 19: 289-90). An MRI from the June 23 visit showed mild multilevel degenerative disc disease, with a bulge from T6/T7 through T10/T11, with no spinal canal or neuroforamina stenosis (R. 272). During this period, she received prescriptions for Vicodin, tramadol, and a TENS unit[7] which she could not afford to fill, and had paraspinal lidocaine injections on July 14, 2010, and a "botulinim toxin injection" on August 19, 2010, all to alleviate the back pain (R. 289-90, 346, 348-49). The treatment notes reflect that she received "3 to 4 hours of good relief" from the lidocaine injections (R. 289, 345, 348). At times, the doctors reported that she was taking up to six Tylenol tablets two to three times a day, and they repeatedly warned her to reduce that amount to prevent damaging her liver (R. 316, 345, 347, 348-49). Notes from June, July, and August also make references to a "pain clinic" and "possible pain clinic eval." (R. 345, 348, 349). At these

---

[7]"TENS stands for (Transcutaneous Electrical Nerve Stimulation), which are predominately used for nerve related pain conditions (acute and chronic conditions). It works by sending stimulating pulses across the surface of the skin and along the nerve strands. The stimulating pulses help prevent pain signals from reaching the brain." TENSUNITS, FREEDOM FROM PAIN AND HARMFUL DRUGS, http://www.tensunits.com (last visited June 17, 2013).

5

visits, Ms. Webster received prescriptions for tramadol and methocarbamol (R. 260, 300, 347, 349). Her pharmacy records also show that on December 13, 2010, she received prescriptions for hydrochlorothiazide,[8] prednisone, albuterol, Norvasc, and beclomethazone (R. 355-60).

## 2.

In connection with her application for benefits, Ms. Webster was examined by Dr. Mahesh Shah, a consulting medical expert for the Bureau of Disability Determination Services, on September 21, 2009 (R. 230-33). Ms. Webster told Dr. Shah that her back pain had begun ten years earlier (R. 230). Though it initially receded with Tylenol, the pain has increased to the point where Tylenol is no longer effective (*Id.*). She stated that she could not stand or walk for more than 15 minutes and has been diagnosed with arthritis of the lumbar spine (*Id.*). Ms. Webster also has a history of asthma, which is exacerbated in the winter (*Id.*). She stated that she had been hospitalized a few times for asthma, with the last hospitalization in 2004 (*Id.*). She also had been diagnosed with high blood pressure six months before (*Id.*).

Dr. Shah listed Ms. Webster's medications as ibuprofen and methocarbamol (*Id.*). She also uses Advair Diskus and an Albuterol inhaler (*Id.*). Ms. Webster's general appearance at the examination was:

> an obese female who was in no acute distress. She walked into the office without any assisting devices. She was able to move around the office without problems. She was able to get up from a chair and get on and off the examining table. She was able to go from sitting to supine position and get up from supine position without any difficulties.

(R. 231). Dr. Shah's examination of her back "revealed mild tenderness in the lumbar region" (R. 232). He also noted that she had full range of motion "in all the joints of the upper and lower extremities," normal gait, and normal grip (*Id.*). She also "was able to heel-walk, toe-walk, and squat down" (*Id.*). Dr. Shah opined that Ms. Webster's asthma and high blood pressure were not

---

[8]"This medicine is a . . .diuretic used to treat high blood pressure" (R. 355).

under good control, her back pain was mild with "fairly good range of motion," and her obesity could aggravate her other problems (R. 233).

On September 24, 2009, Ms. Webster underwent a pulmonary function test, which was performed for Disability Determination Services (R. 234-38). The test showed mild obstruction before and mild restriction after medication (R. 235).

On October 21, 2009, Dr. Virgilio Pilapil, an agency medical consultant, reviewed Ms. Webster's records from Stroger Hospital from October 2008 through May 2009, Dr. Shah's consultative examination report, the September 2009 pulmonary function test results, and the activities of daily living form Ms. Webster completed in September 2009, and opined that Ms. Webster could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk for a total of six hours in an 8-hour workday, sit for a total of about six hours in an 8-hour workday, with no limitations on her ability to push or pull, but with the requirement that she avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation and a prohibition on climbing ladders, ropes, or scaffolds (R. 239-46). He also noted that "[t]he claimant's statements appear partially credible. The severity and/or duration of her symptoms is not supported by objective clinical findings in the file. Therefore, the claimant's claim of total disability cannot be established" (*Id.*).

On February 19, 2010, Dr. Reynaldo Gotanco, another agency medical consultant, reviewed the evidence in Ms. Webster's file and completed an Illinois Request for Medical Advice, affirming Dr. Pilapil's residual functional capacity determination (R. 255-57). In drawing his conclusions, Dr. Gotanco observed that Ms. Webster had raised "[n]o allegations of a new impairment or worsening of previously documented impairments" (R. 257).

7

**C.**

On September 29, 2009, Ms. Webster completed a "Function Report – Adult" and an agency registered nurse completed a "Report of Contact" form summarizing Ms. Webster's physical activities of daily living (R. 177-85, 176). And on December 1, 2009, a "Disability Report" was completed by a field office interviewer that included information from Ms. Webster about her conditions and activities (R. 189-99). These documents describe the activities in which Ms. Webster participates in her daily life. Ms. Webster lives in a house with her elderly sister (R. 176, 177, 199). On a typical day, she rises between 8 and 9 a.m., showers, gets dressed, combs her hair, and makes breakfast (R. 176). She can perform all of these tasks without assistance (*Id.*). She also does chores around the house, like cleaning up, mopping, sweeping, washing, dusting, and cooking (R. 176, 177, 199). She goes shopping and can carry a light bag of groceries containing a bag of potatoes, a gallon of milk, and other items (R. 176, 180).

Ms. Webster goes to the emergency room for her back pain, where she also gets her asthma medications and inhalers (R. 176). She cannot afford a doctor, so she just goes to the emergency room when she cannot bear the pain anymore (*Id.*). Her hobbies include watching television and doing word search puzzles (R. 181). She says she is "up all hours of the night and sometimes [all night] if the pain pills" do not work (R. 178).

**D.**

At the administrative hearing, held on October 19, 2010, two witnesses testified: Ms. Webster and a vocational expert (R. 24). Ms. Webster testified first. She lives in a house with her sixty-eight year old sister (R. 32, 46). She moved here to take care of her sister (R. 46). Her back problems became disabling by April 2009 (R. 32-33). The pain is in the middle of her back (R. 33). When she tries to do housework, the pain becomes "excruciating. . . like somebody

sawing [her] in two" (R. 34). The pain radiates to her shoulders (R. 35). Her medication, Vicodin, which she takes twice a day, makes her dizzy, but she has not discussed changing medications, because she says it is the one that relieves the pain the best (R. 34, 42-43). She also takes five Tylenol tablets at least twice daily (R. 34).

For asthma, Ms. Webster uses inhalers and has a nebulizer (R. 35-36). She is supposed to use the nebulizer twice a day, but can only afford one treatment a day (*Id.*). Ms. Webster smokes a pack of cigarettes a week (R. 41). When she goes to the ER for her back pain, they also give her breathing treatments (R. 45). She suffers from respiratory infections in the winter (R. 45-46).

Ms. Webster's thumb first began swelling and causing pain during winter of 2009, and this now occurs twice each winter (R. 37). She is able to use her hands to pinch, grab, and hold items, unless the thumb swells up (R. 38).

Ms. Webster's back pain flares when she sweeps the floor, but lifting objects, like dishes or a gallon of milk, does not cause pain (R. 39). She cannot walk more than a block and a half without back pain, nor can she sit more than an hour (R. 39-40). Afterward, she needs to take a pill and lay down for an hour (R. 40). She climbs the stairs four to five times daily and can touch her toes and tie her shoes (*Id.*). Twice a day she has to lay down for an hour at a time (R. 41). She grocery shops once a month and does the household chores, like the laundry, vacuuming, cooking, and doing dishes (R. 42, 44). It takes her all week to do all of the household chores because she needs to take lots of breaks (R. 49-50). She gets injections in her back for pain relief every six to eight weeks, and they relieve the pain for three to four days (R. 50-51). She has a referral to a pain clinic, but has not been there yet because every time she calls, "they say it's not processed" (R. 51).

The vocational expert ("VE") then testified. The ALJ asked a series of hypothetical questions, based upon a person closely approaching "advanced age" (which the regulations defined as 50-54 years old, 20 CFR §§ 404.1563(d), 416.963(d)), with a ninth grade education, and work experience as a CNA, who is limited to light work, can never climb ladders, ropes, or scaffolds, and should avoid concentrated exposure to fumes (R. 54-58). The VE testified that the hypothetical person could not perform any of Ms. Webster's past work as a CNA, because it was at the medium exertional level, but she could perform a number of other jobs, such as retail sales (2,747 jobs), arcade attendant (1,307 jobs), or a ticket taker (3,862 jobs) (R. 55-56). When the ALJ added the further limitation that the work be simple, routine, repetitive tasks, the VE concluded that the hypothetical person could perform jobs, such as hand packager (15,663 jobs) or ticket taker (3,862 jobs) (R. 56-57). In response to a question from Ms. Webster's attorney, the VE testified that there would be no jobs at any exertional level for someone who needs to take an unscheduled hour a day to lie down (R. 58-59).

### E.

On November 29, 2010, the ALJ issued a written opinion finding Ms. Webster not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act and denying benefits and supplemental security income (R. 12-19). In evaluating Ms. Webster's claim, the ALJ applied the familiar five-step sequential inquiry for determining disability, which required her to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform her past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a

severe impairment that does not equal one of the listed impairments, she must assess and make a finding about the claimant's residual functional capacity ("RFC") before moving on to Step 4. 20 C.F.R. §§ 404.1520(e), 416.920(e). The ALJ then uses the RFC to determine at Steps 4 and 5 whether the claimant can return to her past work or different available work in the national economy. 20 C.F.R. §§ 404.1520(e)-(g), 416.920(e)-(g). The claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

The ALJ determined that Ms. Webster met the insured status requirements through December 31, 2010 and that she had not engaged in substantial gainful activity since April 1, 2009, the alleged onset date (R. 14). She then found that Ms. Webster's back problems, asthma, and obesity qualified as severe impairments, but that these impairments did not meet or medically equal any listed impairments (R. 14-15).

The ALJ then found that Ms. Webster has the residual functional capacity ("RFC") to perform light work with a sit/stand option; no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs; avoiding concentrated exposure to cold and pulmonary irritants, and that involve simple, routine, and repetitive tasks (R. 15). In support of this finding, the ALJ analyzed Ms. Webster's daily activities, the pulmonary function testing, the conclusions of Dr. Shah, the consulting medical examiner, and the Physical Residual Functional Capacity assessment Dr. Pilapil completed (R. 16). In addition, the ALJ highlighted several treatment records from Ms. Webster's emergency room visits – on October 30, 2008, where the examination revealed only mild tenderness to palpation over the lumbarsacral spine and a negative straight leg test, and on January 21, 2010, where the doctor noted that she had a pain clinic appointment scheduled for the next month, mild

11

osteoarthritis of the first metacarpophalangeal joint, mild lumbosacral discomfort on palpation, and normal gait, with ability to walk on her heels and toes (R. 16).

The ALJ noted a June 23, 2010 MRI of Ms. Webster's thoracic spine, which showed only mild multilevel degenerative disc disease, and then discussed the various pain treatments Ms. Webster received, including a botulinim toxin injection in the thoracic spine on August 19, 2010, with other injections for pain in September and another scheduled for November 2010, which provided three to four days of relief (R. 16-17). The ALJ then stated, "There has been no referral to a pain clinic" and reported that although Ms. Webster testified that "Vicodin makes her sleepy, she takes 2-3 pills a day (with 5 Tylenol in between), and then sleeps for 1-2 hours, there are no restrictions, in the file, from a treating physician" (R. 17). The ALJ also noted that Ms. Webster's treatment remained the same and that there was no discussion of surgery (*Id.*).

Finally, the ALJ addressed Ms. Webster's asthma, finding that she requires a nebulizer twice a day in addition to inhalers, but can only afford one nebulizer treatment a day (R. 17). In addition, the medical record revealed no recent emergency room visits for breathing difficulties (*Id.*). Although the ALJ found Ms. Webster's testimony regarding her asthma credible, the ALJ concluded that the asthma treatments would not preclude employment (*Id.*).

The ALJ afforded "some weight" to the opinion of the agency reviewing doctor that Ms. Webster is capable of performing a limited range of light work, noting that "[t]here is no contrary opinion of any greater limitation from any treating source" (R. 17). The ALJ then concluded that though Ms. Webster is unable to perform any of her past relevant work, there are significant numbers of jobs in the economy that she can perform (R. 17-18). Consequently, the ALJ found Ms. Webster not disabled (R. 18-19).

## III.

Ms. Webster contends that the ALJ improperly assessed her credibility and her RFC. She argues that the ALJ mischaracterized evidence to discredit her, and that the ALJ failed to analyze her obesity and to consider her arthritic left hand in determining her RFC.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). We will not reweigh the evidence or substitute our judgment for that of the ALJ's. *Id.* at 362. A decision denying benefits need not address every piece of evidence, but the ALJ must provide "an accurate and logical bridge" between the evidence and her conclusion that a claimant is not disabled. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court affords the ALJ's credibility determination special deference because she is in the best position to see and hear the witnesses and to assess their forthrightness. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). A reviewing court may "overturn a credibility determination only if it is patently wrong," *Craft*, 539 F.3d at 678, or if the ALJ fails to justify her conclusions with reasons that are supported by the record. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *see Richards v. Astrue*, 370 F. App'x 727, 731 (7th Cir. 2010); *see also Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). To build the required logical bridge for a credibility determination regarding pain, the ALJ must consider not only the objective medical evidence, but also the claimant's daily activities; the duration, frequency, and intensity of pain; any precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; and functional restrictions. SSR 96–7p, 1996 WL

374186, at *3 (July 2, 1996); *accord Villano*, 556 F.3d at 562–63 (requiring an analysis of the factors listed in SSR 96–7p as part of logical bridge for credibility determination).

Ms. Webster asserts that the ALJ erred in assessing her credibility. For the reasons stated below, we agree. The primary defect in the ALJ's decision is that it fails to explain the reasons for rejecting Ms. Webster's claims of limitations from her pain. The opinion does not specify any credibility findings, other than in the paragraph analyzing Ms. Webster's asthma condition, in which the ALJ states: "I find [Ms. Webster's] testimony, regarding her asthma treatment, credible, but even using a nebulizer twice a day for 20 minutes at a time would not preclude employment" (R. 17).

Aside from finding Ms. Webster's asthma claims *credible*, the ALJ never explains the level of credibility she afforded Ms. Webster's other claims. Presumably, the ALJ found Ms. Webster's other claims incredible given her disability ruling, but she never says which statements she discounts and why. We assume that the paragraph preceding the asthma discussion contains the bulk of the facts the ALJ considered pertinent to Ms. Webster's claims of limitations due to back pain and sleepiness from the pain medications. In that paragraph, the ALJ cites to Ms. Webster's claims of debilitating pain and sleepiness as well as her abilities to perform some household chores, the days of relief she received from the back injections, the lack of discussion of surgery or a referral to a pain clinic, the lack of restrictions from a treating physician in response to the alleged drug side effects, and the lack of change in Ms. Webster's treatment (*Id.*).[9] "But cataloguing is no substitute for analysis or explanation." *Smith v. Astrue*, No. 09 C 6210, 2011 WL 722539, at *12 (N.D. Ill. Feb. 22, 2011); *see also Steffen v. Colvin*, No.

---

[9]Presumably, some of the ALJ's earlier discussion of the medical evidence showing only mild tenderness and normal mobility was intended to explain her assessment of Ms. Webster's credibility (Def.'s Mem. at 7, citing R. 16). But the fact that we are left to guess and the government to clarify the ALJ's opaque credibility finding only underscores the problems with the decision.

08 C 3935, 2013 WL 2285788, at *10 (N.D. Ill. May 23, 2013) ("a recitation of facts in close proximity to conclusions leaves it unclear what weight the facts were given and what conclusions they support"); *Byerly v. Colvin*, No. 1:12-CV-91-JEM, 2013 WL 2145596, at *13 (N.D. Ind. May 14, 2013) ("mere inclusion of these facts without a 'logical bridge' linking them to the ALJ's conclusions does not allow for meaningful review... the decision lacks reasoning for how these factors show Plaintiff's testimony to be exaggerated or not credible").

The ALJ's omission leaves us to assume and infer the credibility determination. The social security rules and regulations require an ALJ to do more: "Under Social Security Ruling 96–7p, an ALJ's evaluation of a[n] applicant's credibility must be specific enough to make clear to [the court] how much weight the ALJ gave to the applicant's testimony and the reasons for that decision." *Hill v. Astrue*, 295 F. App'x 77, 81 (7th Cir. 2008); *see also Terry*, 580 F.3d at 477 ("[T]he ALJ must consider the claimant's level of pain, medication, treatment, daily activities, and limitations, 20 C.F.R. § 404.1529(c), and must justify the credibility finding with specific reasons supported by the record."). Here, the ALJ's failure to explain her credibility analysis prevents meaningful review. This overarching omission on its own requires remand, but we flag additional flaws in the ALJ's discussion that compound this error. *See Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011) ("the ALJ gave no reason whatsoever for finding her testimony not credible... That is reason enough for us to reverse the judgment.").

*First*, the ALJ states that "[t]here has been no referral to a pain clinic" (R. 17). This is a puzzling assertion for a variety of reasons, not the least of which is that it contradicts evidence in the record. Earlier in the opinion, the ALJ herself had mentioned a treatment note that reported a pain clinic appointment scheduled for February 16, 2010 (R. 16). In addition, the record contains other references to a pain clinic referral: two treatment notes from January 2010 report

15

a February 16, 2010 pain clinic appointment (R. 301, 304), and notes from June, July, and August 2010 mention "pain clinic" or "[p]ossible pain clinic eval." (R. 345, 348, 349). And, Ms. Webster explained at the hearing that although she had a referral to a pain clinic since August 2010, she had not been able to get in yet because every time she called, "they say it's not processed" (R. 51). Even the Commissioner admits that a treatment note from August 11, 2010 "possibly suggests" that Ms. Webster had been referred to a pain clinic (Def.'s Mem. at 8). The ALJ's statement that there had been no referral to a pain clinic was likely intended to discredit Ms. Webster's claim of back pain; the fact that this statement was erroneous cannot simply be glossed over.

*Second*, the ALJ states, again without explanation, that, "[i]t is also noted that [Ms. Webster's] treatment has remained the same" (R. 17). Without more, it is unclear what the ALJ meant by this statement. It is true that Ms. Webster continued to seek medical care in the Emergency Department at Stroger Hospital. But, as Ms. Webster explained, she goes to the ER because she has no money and no insurance (R. 184). Beyond that, however, a review of the record suggests that her treatment had indeed changed over time. As noted above, in 2010, the doctors in the ER began suggesting a referral to a pain clinic, and they began to try new pain management approaches, including lidocaine injections, botulinim toxin injections, and a prescription for a TENS unit (which Ms. Webster could not afford) (R. 289, 345-46, 348-49). Moreover, Ms. Webster's trips to the ER increased in frequency and by 2010, she had visited the ER at least eight times in the first eight months (R. 265-67, 258-60, 347, 345, 272, 346, 348, 289). The ALJ did take note of the spinal injections, but presumably did not conclude that these qualified as changes in treatment (R. 16-17). In addition, although the ALJ observed that the injections gave Ms. Webster three to four days of relief (R. 17), which is what Ms. Webster

16

stated during the hearing, treatment notes closer in time to the injections reflected that Ms. Webster was getting only three to four hours of relief from the injections (R. 289, 345, 348).

The ALJ failed to explain why she deemed this all to be an unchanged course of treatment, as opposed to a series of varying efforts to control the pain level that Ms. Webster says was increasing. Moreover, the fact that the ER doctors were not recommending surgery neither necessarily supports the ALJ's conclusion that Ms. Webster's treatment was unchanged, nor does it, without more, rebut her claims of severe pain. Perhaps the ALJ was suggesting that Ms. Webster's course of treatment remained conservative, which caused the ALJ to believe that Ms. Webster was exaggerating her claims of pain. Again, if so, the ALJ did not explain the significance of these facts to her ultimate conclusion.

*Third*, while the ALJ reported Ms. Webster's claim that the two to three Vicodin she takes daily "(with 5 Tylenol in between)" cause her to nap one to two hours, the ALJ dismissed that claim because "there are no restrictions in the file, from a treating physician," her treatment "remained the same," and the medical records contained "no discussion of surgery" (R. 17). Thus, in discounting Ms. Webster's claim, the ALJ relied upon the unexplained conclusion that Ms. Webster's treatment had not changed, and two instances of a lack of objective medical evidence. The Seventh Circuit has held that while an ALJ may consider the lack of objective evidence in rejecting a claimant's subjective complaints, *Simila*, 573 F.3d at 519, "the ALJ may not discredit a claimant's testimony about [his] pain and limitations solely because there is no objective medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *see also Ibarra-Montufar v. Colvin*, No. 12 CV 736, 2013 WL 2384265, at *10-11 (N.D. Ill. May 30, 2013). On remand, in considering what weight should be given to the fact that "there are no restrictions, in the file, from a treating physician," the ALJ may wish to consider the fact that

Ms. Webster has no regular treating, primary care physician. Rather, she sees an ever-changing array of doctors during her visits to the ER (at least eleven between August 2008 and August 2010), and rarely sees the same doctor twice. The ALJ should consider what effect that may have on the absence of certain information in Ms. Webster's medical record (such as, the absence of longitudinal care plan).

Moreover, the ALJ failed to address why the substance and quantity of the medications failed to substantiate Ms. Webster's claims of severe pain. Ms. Webster testified that her medications made her dizzy and sleepy (R. 34, 40, 48-49). Her medical records show that from the beginning of her visits to the Emergency Department, doctors repeatedly counseled her to reduce her Tylenol intake or run the risk of liver damage (R. 316, 345, 347, 348-49). Despite these constant warnings, even by the date of the hearing, Ms. Webster says that she was still trying to blunt her claimed pain with high doses of Tylenol, over and above her daily doses of Vicodin. In addition, her records reflect a variety of other drugs prescribed to treat her pain. The ALJ's cursory discussion of Ms. Webster's medications falls short of the requirement that ALJs carefully evaluate all evidence bearing on the severity of pain and give specific reasons for discounting a claimant's testimony about it. 20 C.F.R. § 404.1529; S.S.R. 96-7p; *see also Martinez v. Astrue*, 630 F.3d 693, 696-97 (7th Cir. 2011) (ALJ's opinion lacked explanation of which of claimant's statements are "not entirely credible or how credible or noncredible any of them are" and contained very little discussion of complaints of severe pain and fatigue).

*Fourth*, although the ALJ found Ms. Webster's obesity and asthma to be severe impairments, though not disabling on their own, the ALJ's opinion "failed to consider their effect in exacerbating the problems created by chronic severe pain." *Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010). The ALJ's failure to address the cumulative effect of impairments was

further error. *Id.* (collecting cases); *see also Villano*, 556 F3d at 562-63 (the ALJ failed to analyze the combined effect of claimant's obesity and her other impairments).

*Fifth*, the ALJ also relied on Ms. Webster's activities of daily living, presumably to undermine the credibility of her claims, observing:

> The claimant says that she is unable to sweep or vacuum the floor without aggravating her back symptoms, but by her own testimony, she live [sic] with and cares for her older sister. The claimant said that she is able to cook "everything" and prepare meals three times a week. She shops for food once a month. Although she said it takes her longer to perform other household chores, she is able to complete her chores.

(R. 17). As the Seventh Circuit recently concluded, "[A]lthough it is appropriate for an ALJ to consider a claimant's daily activities when evaluating their credibility, SSR 96–7p, at *3, this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit has repeatedly cautioned that a person's ability to perform daily activities, especially if done only with significant limitations and the need to rest frequently, does not necessarily translate into an ability to work full-time. *Id.* (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011); *Gentle v. Barnhart*, 430 F.3d 865, 867–68 (7th Cir. 2005); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003)).

We do not hold that Ms. Webster is in fact disabled, but because the ALJ failed to build an accurate and logical bridge between the facts of the case and the outcome, we must remand. Given this decision, we find it unnecessary to address whether the ALJ erred in her conclusion that Ms. Webster's left hand arthritis was not a severe impairment. Nonetheless, on remand, the ALJ may wish to examine how and whether the arthritis in Ms. Webster's left hand affects her RFC, when considering all of Ms. Webster's impairments together, both severe and non-severe.

## CONCLUSION

For the reasons set forth above, we grant Ms. Webster's motion for remand (doc. # 13), and we deny the Commissioner's request to affirm (doc. # 18). The case is remanded for further proceedings consistent with this ruling. The case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATE: June 19, 2013